EASTERN DIST.
*March,* 1835.

VAIRIN & REEL
*vs.*
HOBSON & CO.

---

### VAIRIN & REEL *vs.* HOBSON & CO.

APPEAL FROM THE COURT OF THE FIRST JUDICIAL DISTRICT.

The owner of a check, payable to bearer on a bank in New-Orleans, at sight, for six hundred and fifty dollars and forty three cents, having lost it by accident, it was sold at St. Louis, fifteen hundred miles from the place of payment, twenty-five days after date, by a passenger in a steam-boat, to a merchant who went from New-Orleans, for its full value in goods and money, and the latter sold it to the plaintiffs at five per cent. discount, who sued the drawers: *Held,* that the circumstances under which the check came into the possession of the plaintiffs were so suspicious that a person of ordinary prudence ought to have hesitated and examined further before buying, and that no recovery can be had on the check under such circumstances.

This is an action by the holders, to recover from the defendants as drawers, the amount of a check payable to bearer, on the Union Bank of Louisiana,.for six hundred and fifty dollars forty-three cents, dated July 14th, 1834.

The defendants pleaded the general issue, and that the check was given to a customer who lost it, and received another in its place, which was paid ; that the loss was duly advertised ; that the plaintiffs received it long after its date, loss and advertisement, under suspicious circumstances and without a good and valuable consideration.

The evidence showed that Calvin T. Maynard, a respectable merchant of New-Orleans, went passenger in the steamboat Clairborne, to St. Louis, which left New-Orleans the 14th July, 1834, the date of the check sued on. That one Bromley was on the same boat. After their arrival in St. Louis, about the 7th or 10th of August, he was informed by a person that Bromley had the check in question, and that as he (Maynard) was returning to New-Orleans soon, it might suit him to buy it. The check was handed to him at the hotel where he boarded, by a young man in Bromley's presence. He told Bromley if he would take goods he would buy it. Bromley agreed to take three hundred and ninety-four dollars in goods and the balance in cash, which was given for the check.

Maynard had become acquainted with Bromley on the passage up the river, and on being asked if " there was any thing in the appearance of Bromley which indicated him as being a man of bad conduct or morals ?" says he was frolicksome on the voyage, but was considered as an honest man. Maynard showed the check to several persons in St. Louis before he traded for it, and they were of opinion the signatures were genuine. No suspicions were entertained of the check having been improperly obtained, or that it had been lost by its real owner. He did not see any advertisement of the check as having been lost, until after it had been presented to the drawers in New-Orleans.

Maynard sold the check at a discount of five per cent. to one of the plaintiffs, at St. Louis, who purchased it for the

purpose of being remitted to New-Orleans. The discount was admitted to be rather higher than usual for drafts at sight. Plaintiffs offered to take the check at two per cent. discount with the endorsement of Maynard, but finally agreed to take it at five per cent. and run all risks.

Osborne, a witness for the plaintiffs, says he resides in New-Orleans, but went to St. Louis at the time Bromley did, and put up with him at the same hotel. Bromley told him he had received the check from the captain of an English vessel for some gold sovereigns which had been sent to him from England. That the captain preferred keeping the sovereigns, and had given him a check on his merchants, which he supposed was good. That he had been disappointed in a love affair, and had left New-Orleans in such confusion that he had forgot to draw the money out of the bank on his check. This confusion was occasioned by intoxication, having drank freely to drown his disappointment. Witness believed at the time, and still believes, that from the general appearance and manners of Bromley, that he came honestly by the check in question. He states on his cross-examination, that it is not usual for persons going to St. Louis, to take checks payable in New-Orleans. It is not usual for checks, payable at such a distance, to be passed off in trade. The defendants are an English house, doing business in New-Orleans.

The plaintiffs admitted the loss of the check, its advertisement, and second check of same amount, paid on the supposition that the first was lost, and that plaintiffs came into possession of it after loss and advertisement.

The district judge was of opinion that the circumstances under which the check was accounted for and negotiated to the plaintiffs, through Maynard from Bromley, did not authorise a recovery.

Judgment was rendered in favor of the defendants. The plaintiffs appealed.

*Carter*, for the plaintiffs.

*Benjamin,* for the defendants, contended that the evidence clearly showed the check sued on came into the plaintiffs' possession under suspicious circumstances, which ought not to entitle them to recover. The decision of the district judge is supported by the law of the case, and should be affirmed.

*Mathews, J.,* delivered the opinion of the court.

The plaintiffs sue as holders *(bonâ fide* and for a valuable consideration) of a check, drawn by the defendants, on the Union Bank of Louisiana, and made payable to bearer. Judgment was rendered by the court below in favor of the latter, from which the former appealed.

It appears by the facts admitted and the evidence of the case, that the check was lost by the person to whom it was first delivered, and who was the real owner, and its loss advertised, &c. It bears date on the 14th of July, 1834, and was not heard of from that period until about the 10th of August, when it was purchased by a certain Calvin T. Maynard, from one Bromley, who was at that time in possession of it, pretending to be a *bonâ fide* holder. Maynard afterwards sold it to the present plaintiffs, who caused it to be presented to the bank for payment, on the 25th of the month last mentioned, which was refused. The drawers, some time between the 14th of July and the 25th of August, had given another or a duplicate check for the same amount to the person to whom they had delivered the one now in question, on the supposition that it had been irrecoverably lost. Maynard, the immediate transferror to the plaintiffs, is made a competent witness by a release from liability executed by them. By his testimony it is shown that he went on a voyage and carried with him goods for sale, from New-Orleans to St. Louis, in the state of Missouri, in the steamboat Claiborne, which left on the 14th of July, (the date of the check) and arrived at St. Louis on the 24th or 25th of that month. Bromley went passenger with him, and he certainly does not describe the conduct of his fellow passenger to have been such, during the voyage, as ought to have impressed any man of ordinary judgment and observation

favorably towards him, as a person of moral and industrious habits. Soon after their arrival, however, they traded in relation to the check now sued on, and the witness became the purchaser from Bromley, paying rather more than one-half the amount in merchandise, at *a good profit,* and the balance in cash. He soon after transferred it to the plaintiffs, at a discount of five per cent., they paying money for it, &c.

This negotiation was made by the plaintiff, Reel, for the use and benefit of the partnership, who was informed by Maynard of the circumstances under which he had acquired the check.

It results from the whole evidence and admissions of the case that Bromley had no title to this check, and was not a holder in good faith. Having no right to it, he could transfer none, according to a general rule of common sense and of law, that a person cannot give or transfer to another what he has not himself. But in relation to negotiable paper, such as bills of exchange, promissory notes and checks, an exception to this rule prevails in most if not all commercial countries of modern times, according to which purchasers and holders of instruments of this kind may obtain a valid title against the real proprietor from a holder *non domino.* This exception, which is evidently a violation of right, was introduced in aid of trade and commerce now so much carried on by means of credit and a paper medium, and under proper restrictions should be maintained. But when it ought to operate in full power, and when it should merge in the general rule, are questions which must be left, in a great degree, to the discretion of courts of justice, according to the circumstances of each particular case.

In cases relating to bills of exchange, negotiable notes and checks, when they have been stolen or lost, and have been transferred by the thief or finder to another person, the principal questions touching the right acquired by the latter, are 1st, whether the bill, note or check was over due at the time of transfer; 2d, whether the holder paid for it a valuable consideration and took it *bonâ fide.*

Eastern Dist.
*March*, 1835.

VAIRIN & REEL
*vs.*
HOBSON & CO.

In the first of these hypotheses the party taking an instrument of this kind can have no better title to it than the party from whom he takes it ; consequently he cannot recover on it, should it be shown that it had been previously lost or stolen.

As to the second question, it has been ruled by late decisions in the tribunals of England, that the payment of a valuable consideration, for a negotiable note, bill or instrument is not alone sufficient evidence of good faith and fair dealing in the purchaser of such an instrument, when it has been lost or stolen. In addition to this fact, he must show that due diligence was used by him to ascertain the character and standing of the person who offers it for sale or discount. He must examine into probabilities as to the means by which the immediate holder got possession, and if there exist any circumstances in relation to the manner of bringing a paper of this nature into market, calculated to raise suspicions in the mind of a man of ordinary prudence and discretion, the purchaser or acquirer, although for a valuable consideration, will obtain no better title than that which his immediate transferror had. In the cases of *Gill* vs. *Cubits et al.* and *Down* vs. *Halling et al.*, reported in 3 and 4 *Barn. and Cress,* pp. 466 and 330.

The principles recognised in these decisions we believe to be reasonable and just, when the vendor is unknown to the purchaser, &c., and imposes no improper restraints, calculated to impede a fair and honest circulation of negotiable paper, in furtherance of trade and commerce.

If the present case be tested by them the plaintiffs must fail in their action. We shall consider them as standing in a position no better than Maynard would hold, were he plaintiff; because when he sold to them the check in question, he stated to Reel, the partner with whom he negotiated, the circumstances under which he had taken it. Let us examine them: His acquaintance with Bromley, from whom he purchased the check, was made during their voyage from New-Orleans to St. Louis. Bromley was frequently intoxicated during the voyage, and intimated to one of the witnesses in the

The owner of a check, payable to bearer, on a bank in New-Orleans, at sight, for six hundred and fifty dollars and forty-three cents, having lost it by accident, it was sold at St. Louis, fifteen hundred miles from the place of payment, twenty-five days after date, by a passenger in a steam-boat, to a merchant who went from New-Orleans, for its full value in goods and money, and the latter sold it to the plaintiffs at five per cent. discount, who sued the drawers : *Held,* that the circumstances under which the check came in the possession of the plaintiffs, were so suspicious, that a person of ordinary prudence ought to have hesitated and examined further before buying, and that no recovery can be had on the check under such circumstances.

cause, that he was so much so when he left the city, that he forgot to present the check, which he carried with him to St. Louis, to the bank, for payment. The account he gave of himself was ludicrous: he had been an assistant school-master for some time in New-Orleans, was disappointed in a love affair, and to kill the pain of unrequited love, betook himself to intoxicating drafts, &c. The check in question he had taken for gold sovereigns, sent to him from England, (this was done in order to oblige the captain of the vessel who brought them,) and instead of presenting it for payment, carried it with him and offered it for sale in St. Louis, about fifteen hundred miles from the place where it was payable; and there it proved to be worth five per cent less than its nominal value, &c.

Now, it appears to us that there is some thing so ridiculous in his story, and so absurd in the conduct of this man, that any person of ordinary prudence ought to have hesitated and examined further before buying under such circumstances, a paper of this description, and from one who may be said, in a commercial point of view, to have been wholly unknown to the purchaser. Technically speaking, the present holders and plaintiffs did not acquire the check in question free from imputation of *mala fides*. But, laying this consideration aside, was it not over due? It is true, that no time was designated for payment: checks are, however, generally intended for immediate payment, and not for circulation; and when they are held over for an unusual time, and then transferred, they may be considered in the same light as bills taken after they are due; and, considered in this light, the case is clearly with the defendants. See the case cited from 4 *Barn and Cress.*

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs, &c.